United States District Court
Eastern District of New York
-------------------------------------X

ALEXEI GRINT,                              **MEMORANDUM & ORDER**

          *Plaintiff*,                    15-CV-6592 (KAM)

-against-

COMMISSIONER OF SOCIAL SECURITY,
          *Defendant*.

-------------------------------------X

**MATSUMOTO, United States District Judge:**

      Pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. §
1383(c), plaintiff, Alexei Grint ("plaintiff"), appeals the
final decisions of defendant Commissioner of Social Security
("defendant" or the "Commissioner").  The Commissioner denied
plaintiff's application for Disability Insurance Benefits
("DIB") under Title II of the Social Security Act (the "Act") on
the grounds that the plaintiff was not disabled within the
meaning of the Act at any time through September 30, 2011, the
last date insured. The Commissioner also denied, in part,
plaintiff's application for Supplemental Security Income ("SSI")
benefits under Title XVI of the Act, finding that plaintiff was
not disabled prior to March 1, 2012, but became disabled and
consequently eligible for SSI benefits on that date.  Plaintiff
disputes these findings and alleges that he became disabled
under the Act as of April 1, 2010 and is thus entitled to

receive both DIB and SSI benefits due to physical impairments that have prevented him from working since that time.

Presently before the court are defendant's motion for judgment on the pleadings and plaintiff's cross-motion for judgment on the pleadings. For the reasons set forth below, the Commissioner's motion for judgment on the pleadings is granted, the plaintiff's cross-motion for judgment on the pleadings is denied, and the decision of the Commissioner is affirmed.

## Background

The court adopts the factual and procedural background set forth in the Administrative Transcript, the Administrative Law Judge's September 27, 2013 decision, and the parties' respective motions for judgment on the pleadings. This opinion discusses only those facts relevant to the court's determination as set forth herein.

Plaintiff filed an application for DIB under Title II of the Act on March 9, 2011 and an application for SSI benefits under Title XVI of the Act on May 4, 2011. (Tr. 53.)[1] Each application alleged that the onset date of plaintiff's disability was January 1, 2008, though the plaintiff subsequently amended this date, as discussed below. (*Id.*) Plaintiff claimed disability due to "neck problems" and provided

---

[1] Citations to the administrative record are indicated by the abbreviation "Tr."

medical evidence that he suffered from "dizziness, some vertigo, [and] neck pain." (Tr. 121.) The Social Security Administration ("SSA") determined that plaintiff's condition was not sufficient to keep him from working and consequently denied his applications on August 23, 2011. (Tr. 53, 116-121.)

On September 1, 2011, plaintiff filed a written request for a hearing. (Tr. 53.) Plaintiff appeared and testified at the hearing, which took place before Administrative Law Judge ("ALJ") Valorie Stefanelli on January 3, 2013. (Tr. 53; *see also* Tr. 70-110 (consisting of transcript of hearing).) A non-attorney, Asia A. Simmons, represented plaintiff at the hearing. (Tr. 53.) In addition, an impartial vocational expert, Miriam Greene, appeared and testified at the hearing. (Tr. 53, 103-109.) Following the hearing, plaintiff amended the alleged date of onset of disability to April 1, 2010. (Tr. 53, 302.)

On September 27, 2013, the ALJ issued a decision (the "ALJ Decision") denying plaintiff's claim for DIB and SSI benefits for the period from April 1, 2010 through February 28, 2012, and granting his claim for SSI benefits from March 1, 2012 through the date of the decision. (Tr. 53-63.) This outcome was the result of the ALJ's determination that the plaintiff became disabled as of March 1, 2012 but was not disabled prior to that date. (Tr. 53.)

More specifically, the ALJ concluded that the medical record demonstrated that the plaintiff could perform sedentary work, as defined in 20 C.F.R. § 404.1567(a) and 20 C.F.R. § 416.967(a), prior to March 1, 2012. (Tr. 56.)  The ALJ found that prior to March 1, 2012, the plaintiff's residual functional capacity ("RFC") was such that he was capable of performing his past relevant work, specifically that of an analyst and programmer. (Tr. 61.)  The ALJ further concluded that as of March 1, 2012 plaintiff's RFC prevented him from performing his past relevant work and that, based on the vocational expert's testimony, there were no other jobs that existed in significant numbers in the national economy that the plaintiff could perform. (*Id.*)

Accordingly, the plaintiff was found to be disabled under 20 C.F.R. § 404.1520(f) and 20 C.F.R. § 416.920(f) as of March 1, 2012 through September 27, 2013, the date of the ALJ decision, and was entitled to SSI benefits beginning on March 1, 2012. (Tr. 62.)  The ALJ also reviewed the plaintiff's earnings record and determined that his disability insurance had lapsed after September 30, 2011, and accordingly denied his DIB claim because he was uninsured as of the date on which he became disabled.[2]  (Tr. 53, 62.)

---

[2]  The plaintiff does not contest the ALJ's finding regarding the date on which his disability insurance lapsed.

Plaintiff appealed the ALJ Decision to the Appeals Council and on December 2, 2013, made a submission identifying three reasons the ALJ Decision should be vacated and remanded. (Tr. 314-17.)  The plaintiff argued that the ALJ erred when she: (1) "[f]ailed to properly find the lumbar spine and left knee impairments 'severe' at step 2 of the sequential evaluation," (2) "[f]ailed to properly evaluate the [plaintiff's] residual functional capacity," and (3) "[f]ailed to properly evaluate the opinions" of two treating physicians, Dr. Nina Kushner and Dr. Michael Riskevich.  (Tr. 314.)  The plaintiff made an additional submission to the Appeals Council on February 25, 2014, arguing that the ALJ also erred by "failing to properly assess the credibility of the claimant's subjective complaints."  (Tr. 318.)  The Appeals Council denied plaintiff's request for review of the ALJ's decision, making the ALJ Decision the final decision of the Commissioner. (Tr. 5.)

Plaintiff commenced the instant action on December 1, 2015.  (Complaint, ECF No. 1.)  The Commissioner served her motion for judgment on the pleadings on June 1, 2016, (Letter Enclosing Motion, ECF No. 11), and plaintiff filed his cross-motion for judgment on the pleadings and memorandum in support thereof on October 24, 2016.  (Plaintiff's Motion for Judgment on the Pleadings, ECF No. 16; Plaintiff's Memorandum of Law ("Pl. Mem."), ECF No. 17).  The Commissioner filed her papers

with the court on November 14, 2016.  (*See* Notice of Motion, ECF

No. 18; Defendant's Memorandum of Law, ECF No. 19; Defendant's

Reply Memorandum of Law, ECF No. 20.)

## Discussion

### I.   Standard of Review

#### A.   The Substantial Evidence Standard

"Any individual, after any final decision of the

Commissioner of Social Security made after a hearing to which he

was a party . . . may obtain a review of such decision by a

civil action" in a district court.  42 U.S.C. § 405(g)  When a

district court conducts such a review, it may "enter, upon the

pleadings and transcript of the record, a judgment affirming,

modifying, or reversing the decision of the Commissioner of

Social Security, with or without remanding the cause for a

rehearing."  *Id.*

"A district court may set aside the Commissioner's

determination that a claimant is not disabled only if the

factual findings are not supported by 'substantial evidence' or

if the decision is based on legal error."  *Burgess v. Astrue*,

537 F.3d 117, 127 (2d Cir. 2008) (quoting *Shaw v. Chater*, 221

F.3d 126, 131 (2d Cir. 2000)); *accord* 42 U.S.C. § 405(g).

Substantial evidence "means such relevant evidence as a

reasonable mind might accept as adequate to support a

conclusion," and must be "more than a mere scintilla."  *Burgess,*

537 F.3d at 127-28 (quotation marks omitted) (quoting *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004)). The district court must "consider[] the whole record . . . because an analysis of the substantiality of evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted).

If there is substantial evidence in the record to support the Commissioner's factual findings, those findings are conclusive and must be upheld, *see* 42 U.S.C. § 405(g), and "the [reviewing] court may not substitute its own judgment for that of the [ALJ], even if it might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir. 1991) (quoting *Valente v. Sec'y of Health & Human Servs.,* 733 F.2d 1037, 1041 (2d Cir. 1984)).

### B. Insured Status and Five-Step Disability Evaluation

To qualify for DIB and/or SSI, an individual must be disabled. 42 U.S.C. §§ 423(a)(1)(E), 1382(a)(1). An individual is disabled under the Act when he or she is not able "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last" for at least twelve continuous months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment, or impairments, must be "of such severity that [the claimant] is not only unable

to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). To be eligible for DIB an individual must also have been insured within the meaning of 42 U.S.C. § 414 at the time he or she became disabled. 42 U.S.C. § 423(a)(1)(A); *see also* 42 U.S.C. §§ 423(c)(1) and 414(a)-(b) (defining insured status).

To determine whether a claimant is disabled, the SSA follows a five-step sequential analysis, as detailed below. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

### i. *Step One*

At step one, the Commissioner determines whether the claimant is currently engaged in substantial gainful employment. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is engaged in substantial gainful activity, then his or her claim will be denied "regardless of [the claimant's] medical condition or [his or her] age, education, and work experience." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not engaged in substantial gainful employment, the Commissioner will proceed to step two.

### ii. *Step Two*

At step two, the Commissioner determines whether the claimant has a "severe medically determinable physical or mental

impairment" or a "combination of impairments that is severe and meets [the SSA's] duration requirement." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). A severe impairment "must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques," 20 CFR §§ 404.1521, 416.921, and must "significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R §§ 404.1522(a), 416.922(a). Basic work activities include "physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;" ability to see, hear, and speak; ability to understand, perform, and remember simple instructions; use of judgment; appropriate response to supervision, co-workers, and usual work situations; and ability to adjust to changes in a "routine work setting." 20 C.F.R. §§ 404.1522(b), 416.922(b).

In determining whether a claimant's physical or mental impairments are of "sufficient medical severity," the Commissioner "will consider the combined effect of all [the claimant's] impairments without regard to whether any [particular] impairment . . . would be of sufficient severity." 20 C.F.R. §§ 404.1523(c), 416.923(c). In assessing severity, however, the Commissioner will not consider the claimant's age,

education, or work experience.  20 C.F.R. §§ 416.920(c), 404.1520(c).

When considering mental impairments, the Commissioner uses a "special technique" that examines "symptoms, signs, and laboratory findings" to determine whether the claimant has "medically determinable mental impairment(s)," the extent of the claimant's "functional limitations" and the "severity of [his or her] mental impairment(s)."  20 C.F.R. §§ 404.1520a(a)-(d), 416.920a(a)-(d).

Both physical and mental impairments "must be established by objective medical evidence from an acceptable medical source."  20 C.F.R. §§ 404.1521, 416.921.  Additionally, any such impairment, or combination of impairments, must meet the twelve-month duration requirement or be expected to result in death.  20 C.F.R. §§ 404.1509, 416.909.  If the Commissioner determines that the impairment is medically determinable and severe, then the Commissioner will proceed to step three.

### iii. Step Three

At step three, the Commissioner determines whether the claimant's impairment meets or equals an impairment or impairments found in the "Listing of Impairments" contained in appendix 1 of 20 C.F.R. part 404, subpart P and meets the duration requirement.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If the Commissioner determines that the

claimant's impairment meets or equals a "listed" impairment, and satisfies the duration requirement, then the Commissioner will find the claimant to be disabled regardless of age, education, or work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d).

Alternatively, if Commissioner finds that the claimant's impairment does not meet or equal a listed impairment at step three, the Commissioner will assess the claimant's residual functional capacity ("RFC").[3]  20 C.F.R. §§ 404.1520(e), 416.920(e).  A claimant's RFC is the most he or she can do in a work setting despite the limitations imposed by his or her impairment.  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  The Commissioner determines RFC by considering "all the relevant medical and other evidence" in the record.  20 C.F.R. §§ 404.1520(e), 416.920(e).  The Commissioner must consider all of the claimant's impairments, including those that are not "severe."  20 C.F.R. §§ 404.1545(e), 416.945(e).

In determining whether a claimant is disabled, the Commissioner considers all of the claimant's symptoms "and the extent to which [the] symptoms can reasonably be accepted as

---

[3]    The Commissioner's RFC analysis takes place between step three and step four.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) ("Before [the Commissioner] goes from step three to step four, [the Commissioner] assess[es] [the claimant's] residual functional capacity.").  Regardless of whether it is discussed as part of step three, part of step four, or an intermediate quasi-step, the RFC analysis must come after a determination that the plaintiff has a severe impairment that does not meet or equal a listed impairment at step three and before a determination as to whether the claimant can perform past relevant work at step four.  *See id.; see also* 20 C.F.R. §§ 404.1520(a)(4)(iii)-(iv), 416.920(a)(4)(iii)-(iv).

consistent with the objective medical evidence and other evidence." 20 C.F.R. §§ 404.1529(a), 416.929(a). The Commissioner's evaluation of symptoms is a two-step process.

First, the Commissioner must determine whether "objective medical evidence from an acceptable medical source" shows that "[the claimant] ha[s] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* Second, if such an impairment exists, the commissioner must "evaluate the intensity and persistence of [the claimant's] symptoms," considering "all of the available evidence," to determine "how [the] symptoms limit [the claimant's] capacity for work." 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).

The Commissioner must consider whether the claimant's symptoms are consistent with objective medical evidence, but will not disregard a claimant's statements about their symptoms "solely because the available objective medical evidence does not substantiate [the claimant's] statements." 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2). The Commissioner will carefully consider all information that the claimant submits about his or her symptoms, including from non-medical sources. 20 C.F.R. §§ 404.1529(c)(2)-(3), 416.929(c)(2)-(3). Further, in reaching a conclusion, the Commissioner will "consider whether there are any inconsistencies in the evidence and the extent to which

there are any conflicts between [the claimant's] statements and the rest of the evidence," including the claimant's history, laboratory findings, and "statements by [the claimant's] medical sources or other persons about how [the claimant's] symptoms affect [the claimant]." 20 C.F.R. §§ 1529(c)(4), 416.929(c)(4).[4]

### iv. Step Four

At step four, the Commissioner must determine whether the claimant's RFC permits the claimant to perform his or her "past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Past relevant work is "work that [the claimant] ha[s] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it." 20 C.F.R. §§ 404.1560(b)(1), 416.960(b)(1). If the claimant can perform his or her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(f), 416.920(f). If the claimant cannot perform his or her past relevant work, the Commissioner will move to step five.

---

[4] The court notes that the SSA recently published a Social Security Ruling ("SSR") relating to the proper evaluation of a claimant's statements about his or her symptoms, and that this SSR modified prior SSA guidance as to the ALJ's ability to make a "credibility" determination regarding the claimant's statements. *Compare* SSR 16-3P, Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2016 WL 1119029 (SSA Mar. 16, 2016) *with* SSR 96-7P, Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 1996 WL 374186 (SSA July 2, 1996). The court further notes that these rulings do not change the applicable regulations as set forth in the Code of Federal Regulations, and that prior to the issuance of SSR 16-3P on March 16, 2016, SSR 96-7P was controlling, and allowed ALJs to assess the credibility of the claimant during the RFC determination. *See* SSR 96-7P, 1996 WL 374186, at *1-2.

### v.  Step Five

In the fifth and final step of the sequential analysis, the Commissioner determines whether the claimant can perform "alternative occupations available in the national economy" in light of his or her RFC and vocational factors of age, education, and work experience.  *Dixon v. Shalala*, 54 F.3d 1019, 1022 (2d Cir. 1995) (quoting *Dixon v. Heckler*, 785 F.2d 1102, 1103 (2d Cir. 1986)); *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  If the claimant can transition to other work that "exist[s] in significant numbers in the national economy," the claimant is not disabled; if the claimant cannot transition, the Commissioner must find the claimant disabled.  20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1), 404.1560(c), 416.960(c).

### vi.  Burden of Proof

The claimant must prove his or her case at steps one through four and "has the general burden of proving that he or she has a disability within the meaning of the Act."  *Burgess*, 537 F.3d at 128 (citations omitted).  At the fifth step, the burden shifts to the Commissioner to show that in light of the claimant's RFC, age, education, and work experience, he or she is "able to engage in gainful employment within the national economy."  *Sobolewski v. Apfel*, 985 F. Supp. 300, 310 (E.D.N.Y. 1997); *see also Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir.

1999).  At step five, the Commissioner need not provide additional evidence about the claimant's RFC, and need only show that there is work in the national economy that the claimant can do.  20 C.F.R. §§ 404.1560(c)(2), 419.960(c)(2); *accord Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *see also* 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).

### C. Treating Physician Rule

The Commissioner must evaluate every medical opinion in the record, "[r]egardless of its source," when determining whether an individual is disabled.  20 C.F.R. §§ 404.1527(c); 416.927(c).  The Commissioner will give the medical opinion of a treating physician or psychologist "controlling" weight if the Commissioner finds that the opinion as to the "nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2); *see also Burgess,* 537 F.3d at 128 (describing the principle as the "treating physician rule" (citations omitted)); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("When . . . substantial evidence in the record conflicts with the treating physician's opinion, however, that opinion will not be deemed

controlling.").[5]  Medically acceptable clinical and laboratory

diagnostic techniques include consideration of a "patient's

report of complaints, or history, [a]s an essential diagnostic

tool."  *Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir.

2003) (quoting *Flanery v. Chater*, 112 F.3d 346, 350 (8th Cir.

1997)); *accord Burgess,* 537 F.3d at 128.

Additionally, opinions from other medical sources that

are not "acceptable medical sources" under applicable

regulations are nevertheless "important and should be evaluated

on key issues such as impairment severity and functional

effects."  *Anderson v. Astrue*, No. 07-CV-4969, 2009 WL 2824584,

at *9 (E.D.N.Y. Aug. 28, 2009) (quoting SSR 06-03P, Titles II

and XVI: Considering Opinions and Other Evidence from Sources

Who Are Not "Acceptable Medical Sources" in Disability Claims,

2006 WL 2329939, at *3 (SSA Aug. 9, 2006)).[6]

When a treating physician's opinion is not given

controlling weight, the ALJ must "comprehensively set forth his

---

[5]     The court notes that the SSA recently adopted regulations that change
the standards applicable to the review of medical opinion evidence for claims
filed on or after March 27, 2017.  *See* 20 C.F.R. §§ 404.1520c, 416.920c.
Because plaintiff filed his claims before that date, the court applies the
treating physician rule under 20 C.F.R. §§ 404.1527 and 416.927, and not 20
C.F.R. §§ 404.1520c and 416.920c.  *See id.*
[6]     The court notes that the SSA recently rescinded SSR 06-3P as no longer
applicable to claims filed on or after March 27, 2017, and adopted new
regulations for evaluating medical sources that are not "acceptable medical
sources," as well as nonmedical sources, for such claims.  *See Rescission of
Social Security Rulings 96-2P, 96-5P, and 06-3P*, 82 Fed. Reg. 15263-01 (Mar.
27, 2017).  Because plaintiff's claim was filed before that date, the new
regulations do not apply here.

[or her] reasons for the weight assigned to a treating physician's opinion." *Burgess,* 537 F.3d at 129 (quoting *Halloran* 362 F.3d at 33); *accord* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Failure to provide "good reasons" for the weight assigned to a treating physician constitutes a ground for remand. *Snell*, 177 F.3d at 133 (citation omitted); *see also Halloran*, 362 F.3d at 33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physicians opinion.").

Although applicable regulations do not exhaustively define what constitutes "good reason" for the weight given to a treating physician's opinion, the ALJ must consider, *inter alia*, "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence, and (4) whether the physician is a specialist." *Selian v. Astrue,* 708 F.3d 409, 418 (2d Cir. 2013) (citing *Burgess*, 537 F.3d at 129); *see also* 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). These same factors may also be used to guide evaluation of other sources' opinions. *Canales v. Comm'r of Soc. Sec.*, 698 F. Supp. 2d, 335, 344 (E.D.N.Y. 2010) (citing SSR 06-3P, 2006 WL 2329939, at *4); *see also* 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

**D. ALJ's Duty to Develop the Record**

Because benefits proceedings are non-adversarial in nature, "the social security ALJ, unlike a judge in a trial, must on behalf of all claimants affirmatively develop the record." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (quoting *Tejada*, 167 F.3d at 774); *see also Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999) ("Because a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." (citation omitted)). Consequently, the ALJ has a duty to obtain additional information from a treating physician where the claimant's medical record is inadequate. *See Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] *sua sponte*." (citation omitted)).

Therefore, even though the court will afford the ALJ's determination substantial deference, a remand for further findings may be appropriate where the ALJ does not fulfill his or her affirmative obligation to develop the record. *See Butts v. Barnhart*, 388 F.3d 377, 386 (2d Cir. 2004) ("[I]n cases where the ALJ fail[s] to develop the record sufficiently to make appropriate disability determinations, a remand for further findings that would so plainly help to assure the proper disposition of the claim is particularly appropriate." (internal

quotation marks and citation omitted)); *see also Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755-57 (2d Cir. 1982) (noting that, in deciding whether substantial evidence supports the Commissioner's findings, courts must first ensure that claimant has a full and that all relevant facts are developed).

The ALJ's duty to develop the record applies to both *pro se* and represented parties, and is heightened in the case of *pro se* plaintiffs. *Batista v. Barnhart,* 326 F. Supp. 2d 345, 353 (E.D.N.Y. 2004) (citing *Echevarria*, 685 F.2d at 755, *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999), and *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996)); *accord Moran v. Astrue*, 569 F.3d 108, 112-13 (2d Cir. 2009).

## II. The ALJ's September 27, 2013 Decision

### A. Insured Act Requirements Analysis

Because plaintiff sought DIB, the ALJ reviewed plaintiff's earnings records to determine his insured status. (Tr. 53.)  The ALJ determined that plaintiff had "acquired sufficient quarters of coverage to remain insured through September 30, 2011," and was uninsured after that date.  (Tr. 53, 55.)

### B. The ALJ's Analysis at Steps One through Three

After considering the entire record, the ALJ concluded at step one of the five-step analysis that plaintiff had not

engaged in substantial gainful activity since April 1, 2010, the amended alleged onset date. (Tr. 55.) At step two the ALJ found the plaintiff had two severe impairments: degenerative disc disease of the cervical spine[7] and hyperlucent density of the cerebellum.[8] (*Id.*) The ALJ also noted that the record reflected a "recent diagnosis of lumbar degenerative disc disease,"[9] and that plaintiff sustained a tear of the anterior

---

[7] Degenerative disc disease is a condition in which pain is caused by damaged spinal discs, which are situated between bones in the spine, act as cushions or shock absorbers, and allow the spine to bend. *E.g.*, Cedars-Sinai, *Degenerative Disc Disease*, *available at* https://www.cedars-sinai.edu/Patients/Health-Conditions/Degenerative-Disc-Disease.aspx (last visited Feb. 28, 2018); Univ. of Md. Med. Ctr., *A Patient's Guide to Degenerative Disc Disease*, *available at* http://www.umm.edu/programs/spine/health/guides/degenerative-disc-disease (last visited Feb. 28, 2018). The cervical spine is the area around the neck. *See* Emory Healthcare, *Cervical Radicular Pain*, *available at* https://www.emoryhealthcare.org/pain-management/cervical-radicular-pain.html (last visited Feb. 28, 2018).

[8] The cerebellum is the part of the brain that controls coordination and balance. Nat'l Inst. of Neurological Disorders & Stroke, *Cerebellar Disorder Information Page: Definition*, *available at* https://www.ninds.nih.gov/Disorders/All-Disorders/Cerebellar-Degeneration-Information-Page (last visited Feb. 28, 2018). The ALJ Decision does not explain what "hyperlucent density of the cerebellum" means, and the court has been unable to locate a medical definition for this condition. The record contains several references to issues with plaintiff's cerebellum, including an MRI-based finding of a "chronic lacunar infarction within [the left] cerebellum" suggesting "likely irreversible damage to cerebellar structures," (Tr. 359-60), a finding of "[s]table small chronic wedge shaped lacunar infarctions" in the "left cerebellar hemisphere," (Tr. 431), and a statement that a brain MRI suggests "[two] old left cerebellar strokes." (Tr. 448.) The ALJ Decision referenced the first of these findings. (Tr. 57 (citing Tr. 359.) Nevertheless, neither party challenges the propriety of the ALJ's conclusion regarding this impairment. The court therefore defines "hyperlucent density of the cerebellum" to mean a finding of an unspecified disease or disorder of, or damage to, the cerebellum, although the degree and effects are not clear.

[9] As noted above, spinal discs are situated between bones in the spine and act as cushions or shock absorbers and allow the spine to bend. The lumbar spine is located in the lower back area of the body. Amer. Academy of Orthopaedic Surgeons, *Spine Basics*, *available at* http://orthoinfo.aaos.org/topic.cfm?topic=a00575 (last accessed Feb. 28, 2018).

cruciate ligament ("ACL") of his left knee in 2009.[10]  (Tr. 56.)
The ALJ found that the record did not contain sufficient
evidence that the plaintiff's lumbar degenerative disc disease
constituted a "severe" impairment.  (*Id.*)  As to the plaintiff's
ACL tear, the ALJ noted that the record contained "notes taken
only a few months [after the tear] show[ing] that [plaintiff]
had a normal gait, full range of motion, and was doing well with
conservative management of the ACL tear with no further
limitations."  (*Id.*)  Based on this record evidence, the ALJ
found that the ACL tear was a "non-severe" impairment.  (*Id.*)

At step three, the ALJ found the plaintiff's
impairments did not meet or medically equal the severity of the
listed impairments in the regulations that would conclusively
require a disability determination.  (Tr. 56.)  The ALJ
specifically considered sections 1.01 *et seq.* and 11.01 *et seq.*
of the Listing of Impairments, which respectively address
musculoskeletal and neurological impairments, and concluded that
the plaintiff did "not have the signs, symptoms, or laboratory

---

[10]    The ACL "runs diagonally in the middle of the knee" and "prevents the
tibia," which is a bone in the lower leg, "from sliding out in front of the
femur," the bone in the upper leg/thigh.  Amer. Academy of Orthopaedic
Surgeons, *Anterior Cruciate Ligament (ACL) Injuries*, *available at*
http://orthoinfo.aaos.org/topic.cfm?topic=a00549 (last accessed Feb. 28,
2018).  The ACL also "provides rotational stability to the knee." *Id.*

findings as outlined in those listings as required" for a finding of disability. (Tr. 56.)[11]

### C. The ALJ's RFC Analysis

Following her determinations at step three, the ALJ analyzed the plaintiff's RFC by first determining whether the plaintiff suffered a medically determinable impairment that could reasonably be expected to produce the plaintiff's pain or other symptoms, and second, determining whether the intensity, persistence, and limiting effects of the symptoms limited plaintiff's functioning. (Tr. 56-61.) The ALJ noted that plaintiff's alleged symptoms and limitations included "extremely limited activities of daily living" and "impaired concentration due to pain," and that he reported "intermittent headaches and dizziness associated with a loss of balance." (Tr. 57; *see also* Tr. 83-88 (plaintiff's testimony regarding symptoms).) The ALJ considered the plaintiff's testimony at the hearing held on January 3, 2013, contemporaneous statements made to physicians regarding plaintiff's symptoms and limitations, and notes from

---

[11] The ALJ Decision does not expressly state which of the plaintiff's impairments she evaluated at step three. However, because proceeding to step three is only appropriate where a claimant's impairment or impairments are found to be severe, *see* 20 C.F.R. §§ 404.1520(a)(4)(ii)-(iii), 416.920(a)(4)(ii)-(iii), and because the ALJ specifically considered the portions of the Listing of Impairments relating to the musculoskeletal system and neurological disorders, (Tr. 56), it appears clear from the record that the ALJ evaluated the plaintiff's "severe" impairments, specifically degenerative disc disease of the cervical spine and hyperlucent density of the cerebellum, to determine whether they met or medically equaled any impairment found in the Listing of Impairments.

physicians who treated and/or examined plaintiff.  (Tr. 56-61.)
The ALJ also considered opinion evidence from treating sources.
(Tr. 58-61.)

The ALJ determined that, at all relevant times prior
to March 1, 2012, the plaintiff had the residual functional
capacity to perform sedentary work as defined in 20 C.F.R. §§
404.1567(a) and 416.967(a).  (Tr. 56, 59.)  The ALJ also
determined that beginning March 1, 2012, the plaintiff "would be
expected to be off task more than 10% of the workday due to
needing to adjust positions, lie down, or be off task [due] to
pain or other symptoms."  (Tr. 59.)

### i.   RFC Prior to March 1, 2012

For the period prior to March 1, 2012, the ALJ found
that plaintiff had medically determinable impairments that could
reasonably be expected to cause plaintiff's alleged symptoms,
(Tr. 58), but that record evidence did not support the
plaintiff's assertions regarding his limitations.  (Tr. 59.)

Addressing plaintiff's cervical spine condition, the
ALJ noted that he had an initial consultation at a spine clinic
in 2005 for neck pain radiating to the left arm and, following
an MRI that showed disc herniation and severe nerve root
compression, underwent disc replacement surgery that same year
with good results.  (Tr. 57.)  Additionally, the ALJ discussed
record evidence indicating that plaintiff continued to work and

maintain an active lifestyle for several years, including an office note from plaintiff's visit to the Hospital for Special Surgery's Sports Clinic in March 2009 indicating that plaintiff was "active" and held an administrative position at a bank. (*Id.* (citing Tr. 326).)  The same office visit note also indicated that plaintiff was injured in a skiing accident in February 2009.  (*Id.* (citing Tr. 326).)

The ALJ also cited an office note from plaintiff's August 2010 five-year post-surgical follow-up examination, which was performed by Dr. Jeffrey Lewis and a Certified Registered Physician's Assistant.[12]  (Tr. 57 (citing Tr. 374).)  That office note indicated that plaintiff was doing "extremely well" with "no real complaints of 'true neck pain,'" or "upper extremity radicular symptoms."  (Tr. 57 (quoting and citing Tr. 374).) The August 2010 office note also referenced a then-recent cervical spine x-ray that looked "quite good," and indicated that plaintiff was working, though the office note did not elaborate on the nature of the employment.[13]  (Tr. 57 (quoting and citing Tr. 374-75).)

---

[12]     The court notes that both Dr. Lewis and a Certified Registered Physician's Assistant affiliated with the same medical practice signed this report, as well as other post-surgical follow-up examination reports referenced in this order.  For the sake of simplicity, the court will omit further reference to the Physician's Assistant.
[13]     The ALJ noted that this work activity was not reflected in plaintiff's most recent earnings queries.  (Tr. 57.)

With respect to plaintiff's cerebellar impairment, the ALJ noted that since a March 2010 accident in which plaintiff hit his head on a door, plaintiff "reported intermittent headaches and dizziness associated with a loss of balance," and that MRI scanning of plaintiff's brain "confirmed chronic lacunar infarction within the [plaintiff's' left cerebellum."[14] (Tr. 57.)

The ALJ then wrote that, despite these conditions, plaintiff was able to sustain an active lifestyle through at least 2010. In support of this, the ALJ cited to the portion of the record containing notes from, *inter alia*, plaintiff's various visits to the Hospital for Special Surgery, including its Sports Clinic, as well as 2010 post-surgical follow-up visit to Dr. Lewis and other visits to the practice with which Dr. Lewis was affiliated. (Tr. 57 (citing Tr. 321-32, 374, 544-61).)

The ALJ also specifically discussed a consultative examination plaintiff underwent in August 2011, undertaken by Dr. David Finkelstein. (Tr. 57-58.) The ALJ noted that the treatment records from the August 2011 examination indicate that

---

[14] A brain infarction occurs when a group of brain cells dies and are replaced by a cavity, which is known as an infarct. Nat'l Inst. of Neurological Disorders and Stroke, *Stroke: Hope through Research*, *available at* https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Hope-Through-Research/Stroke-Hope-Through-Research (last accessed Nov. 13, 2017). A lacunar infarction is a small infarction that results from the narrowing of a small artery in the brain. *Id.*

plaintiff had a very active lifestyle and engaged in a full range of activities of daily living, including cooking, cleaning, shopping, showering, dressing, watching television and socializing.  (*Id.* (citing Tr. 389-91).)  The examination records also indicate that an examination of the plaintiff revealed, among other things, normal gait and station, full grip strength, and full range of motion in the cervical spine with only minimal tenderness.  (Tr. 58 (citing Tr. 389-91).)[15]

Summarizing the record evidence bearing on plaintiff's RFC prior to March 1, 2012, the ALJ referred to the aforementioned medical records generally, and specifically to a statement in the office notes from plaintiff's August 2010 five-year post-surgical follow-up examination that plaintiff "was staying active with activities such as dancing."  (Tr. 58 (citing Tr. 374).)  The ALJ also observed that plaintiff denied "all reports of activities" in his sworn testimony before the ALJ, including a denial that he had been skiing despite the office notes indicating that plaintiff had injured his knee in a skiing accident on February 25, 2009.  (Tr. 58; *see also* Tr. 78-79 (denying skiing); Tr. 326 (office note stating that plaintiff

---

[15]    The August 2011 examination record expressed plaintiff's grip strength as "5/5 bilaterally."  (Tr. 58, 390).  Muscle strength is expressed using a scale of 0 to 5, with 0 indicating "no muscle activation" and 5 indicating "muscle activation against examiner's full resistance" and a "full range of motion."  Usker Naqvi and Andrew I. Sherman, *Muscle Strength Grading*, *available at* https://www.ncbi.nlm.nih.gov/books/NBK436008/ (last accessed Feb. 28, 2018).

reported injuring his left knee while skiing on February 25, 2009).)  The ALJ also noted that plaintiff denied living in Moscow in his testimony before the ALJ, though the record contained references to plaintiff living in Moscow, Russia. (Tr. 58 (citing Tr. 561, 670).)  The ALJ specifically noted an email exchange in which a medical provider questioned plaintiff as to whether he lived in Russia, and plaintiff responded that he still had a mailing address in Brooklyn.  (Tr. 58 (citing Tr. 670).)  On the basis of the foregoing record evidence, the ALJ found plaintiff to be "less than credible."  (Tr. 58.)

The ALJ then discussed the opinions of two treating sources, Dr. Nina Kushner and Dr. Michael Riskevich, as they relate to the plaintiff's pre-March 1, 2012 RFC.  The ALJ credited Dr. Kushner's May 2011 opinion that plaintiff had no limitations as supported by objective evidence, specifically as conveyed in the office notes from plaintiff's August 2010 post-surgical follow-up examination.[16] (*Id.*)  On the other hand, the ALJ gave little weight to Dr. Kushner's December 2011 opinion that plaintiff "could occasionally lift and carry 5 pounds, would frequently have pain and fatigue that would interfere with daily routines and concentration, could not perform pushing, and

---

[16]    The ALJ appears to attribute the statements in the office note to Dr. Kushner herself, rather than to Dr. Lewis and his Physician's Assistant. (*See* Tr. 58.)  It appears that this confusion may have arisen because the document setting forth the office notes is styled as a letter *to* Dr. Kushner from Dr. Lewis and his Physician's Assistant.  (*See* Tr. 374.)

would need to avoid heights." (*Id.*)  The ALJ explained that Dr.

Kushner's December 2011 opinion lacked information as to when

these limitations began and contained no treatment notes to

support the limitations proposed.  (*Id.*)  The ALJ also observed

that the plaintiff's treatment during this time was sporadic and

there was no evidence demonstrating that his symptoms worsened

between Dr. Kushner's May and December 2011 opinions (other than

the December 2011 opinion itself).  (Tr. 58-59.)

The ALJ also afforded little weight to Dr. Riskevich's

April 2011 opinion that plaintiff could sit for only one hour in

an eight-hour work day, "could not stand or walk, and could

never lift, carry, bend, squat, or climb," and "could

occasionally reach, but could not use the left upper extremity

for simple grasping, and could not use either upper extremity

for pushing, pulling, or fine manipulation."  (Tr. 59.)  The ALJ

wrote that this opinion was inconsistent with examination

records from the April 2010-February 2011 period to which Dr.

Riskevich referred, as the examination records reflected that

plaintiff consistently reported a full range of activities of

daily living and contained "essentially normal" objective tests.

(*Id.* (citing Tr. 366-382).)  Similarly, the ALJ afforded little

weight to Dr. Riskevich's February 2011 opinion that plaintiff

could not work for 12 months as it was "internally inconsistent"

and contradicted by plaintiff's own function report.  (*Id.*; *see*

*also* Tr. 288-96 (consisting of plaintiff's function report dated May 16, 2011).)

The ALJ concluded that prior to March 1, 2012, plaintiff had the residual functional capacity to perform sedentary work, lift and/or carry ten pounds occasionally and less than ten pounds frequently, stand and/or walk for two hours in an eight-hour workday and sit approximately six hours in an eight-hour workday, and occasionally grasp with the left non-dominant upper extremity. (Tr. 56.)

### ii. RFC as of March 1, 2012

For the period beginning March 1, 2012, the ALJ found that plaintiff had medically determinable impairments that could be reasonably expected to cause the alleged symptoms. (Tr. 58-59.) In contrast to the period before March 1, 2012, however, the ALJ found plaintiff's allegations regarding his symptoms and limitations to be credible. (Tr. 59.)

The ALJ referenced plaintiff's treatment notes, statements at consultations, examination data, therapy outcomes, and hearing testimony, noting how the limitations were consistent and treatment was sought for them. (Tr. 59-60.) The ALJ afforded little weight to the May 2012 New York State agency medical consultant, which identified few limitations, because the "evidence support[ed] additional imitations based on the objective findings alone." (Tr. 60-61 (citing Tr. 403-09).)

On the other hand, the ALJ afforded great weight to the March and August 2012 opinions of Dr. Igor Khelemsky, a treating source, because they were "consistent with the objective findings showing a severe worsening of the plaintiff's condition in March 2012 with progression through the remainder of 2012 and into 2013." (*Id.*) The ALJ specifically noted that in August 2012, Dr. Khelemsky opined that plaintiff's abilities to grasp, perform fine manipulations, and reach on this right side were limited, as was plaintiff's ability to reach on his left. (Tr. 60.) The ALJ also noted that the same opinion indicated that plaintiff would be expected to miss more than three days of work per month and could not perform push/pull activities. (Tr. 60-61) Further, the ALJ noted that Dr. Khelemsky's March 2013 opinion indicated that plaintiff was unemployable for the next 6-12 months and was currently disabled. (Tr. 61.)

Considering the record as a whole, the ALJ concluded that beginning March 1, 2012, plaintiff had the residual functional capacity to perform sedentary work as defined in 20 CFR §§ 404.1567(a) and 416.967(a), and that his allegations regarding symptoms and limitations were "generally credible." (Tr. 59.) Additionally, beginning on March 1, 2012, plaintiff would be expected to be off task more than ten percent of the

workday due to needing to adjust positions, lie down, or due to pain or other symptoms. (*Id.*)

**D.    The ALJ's Analysis at Step Four**

At Step Four, the ALJ found that prior to March 1, 2012, plaintiff was capable of performing past relevant work as an "analyst and programmer." (Tr. 61.) The ALJ found that these positions were past relevant work, and that plaintiff's RFC enabled him to perform such work. (*Id.*) Based on the testimony of the vocational expert, the ALJ further found that plaintiff would have retained the skills necessary to perform such work, and that such work is performed in the national economy. (*Id.*) As of March 1, 2012, however, plaintiff became unable perform his past relevant work due to the combination of his physical limitations and his likelihood of being off task for at least 10% of the workday. (*Id.*)

**E.    The ALJ's Analysis at Step Five**

At step five, the ALJ considered plaintiff's ability to transition to other work as of March 1, 2012.  (Tr. 61-62.) The ALJ concluded that plaintiff lacked work skills transferable to other occupations within his RFC, and there were no jobs that existed in significant numbers in the national economy that plaintiff could perform.  (*Id.*)  Based on these determinations, the ALJ found that plaintiff was not disabled prior to March 1, 2012, but became disabled on that date and has continued to be

disabled. (Tr. 62.) As such, the ALJ determined that plaintiff qualified for SSI as of March 1, 2012, but he did not qualify for DIB because he did not meet the insurance requirements as of the date on which he became disabled. (*Id.*)

## III. Analysis

In the instant motions, the Commissioner contends that the ALJ decision should be affirmed, whereas plaintiff seeks reversal of the ALJ Decision and remand for calculation of retroactive DIB and SSI benefits, and future DIB and SSI benefits, or in the alternative, remanding the case for a new administrative hearing solely to determine if the plaintiff was disabled prior to March 1, 2012.

Upon review of the administrative record, the ALJ Decision, and the instant cross-motions, the court finds that there is substantial evidence to support the ALJ's Decision, and that it should be affirmed.[17]

---

[17] The court notes that although plaintiff's memorandum of law includes extensive transcription of notes from plaintiff's visits to doctors, it offers virtually no explanation of the significance or relevance of the information set forth in the treatment note. As an example, in arguing that the ALJ erroneously failed to afford Dr. Riskevich's conclusions controlling weight, plaintiff states that Dr. Riskevich's treatment notes indicate that "[t]here was spasm of the gluteus muscle and trigger point of the left trochanteric bursa, bicipital tendon, and deltoid." (Pl. Mem. at 25 (citing Tr. 352).) Plaintiff does not explain what any of this means, or why it is relevant to the weight that Dr. Riskevich's opinion should be given. The court has nevertheless carefully reviewed the administrative record, and addresses the information in the record relevant to the bases on which plaintiff seeks reversal and remand.

**A.     Severity of Lumbar Spine and Knee Impairments**

Plaintiff contends that the ALJ committed reversible error in finding, at step two of the five-step analysis, that plaintiff's lumbar degenerative disc disease and torn ACL were "non-severe" impairments as they "presented greater than minimal functional limitations on basic work activities." (Pl. Mem. at 16-18; *see also* Tr. 56.)

***i.     Lumbar Spine Impairment***

Plaintiff contends that the ALJ should have found plaintiff's lumbar spine degenerative disc disease "severe" in light of reports from two diagnostic examinations, specifically reports of pain and a finding of bulging discs in 2006, (Pl. Mem. at 17 (citing Tr. 442, 468-69)), and based on an MRI finding in 2009 that revealed "developmental stenosis, [and] superimposed multilevel spondylosis with annular tears and protrusions." (*Id.* (citing Tr. 459-61).)

The court concludes that the ALJ did not err in finding plaintiff's lumbar spine degenerative disc disease "non-severe." (Tr. 56.) The focus of the severity analysis is the effect that an impairment has on the claimant, 20 C.F.R §§ 404.1522(a), 416.922(a), and specifically on the claimant's ability to perform basic work activities, including, in relevant part, "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, [and] handling." 20 C.F.R. §§

404.1522(b)(1), 416.922(b)(1).  Additionally, at step two, the
burden is on the claimant to prove his case (though the ALJ has
an affirmative obligation to develop the administrative record).
*Burgess*, 537 F.3d at 128 (citations omitted).

Here, plaintiff cites evidence that suggests the
existence of an impairment, which is not in dispute, but cites
no evidence supporting a loss of function.  (*See* Pl. Mem. at 17
(describing medical records from 2006 and 2009).)  Moreover, the
ALJ adequately developed the record as to plaintiff's lumbar
spine condition, and that record provides substantial evidence
that plaintiff's lumbar spine condition did not limit his basic
work activities.

Plaintiff's own testimony at his hearing before the
ALJ undermines his argument to the court here.  Specifically,
plaintiff refers to MRI results from 2006 in arguing that his
lumbar spine impairment should have been found "severe."  (Pl.
Mem. at 17.)  However, at plaintiff's hearing, the ALJ asked
plaintiff to "describe the symptoms he was feeling back in 2008"
that impacted his ability to work, and plaintiff stated that he
had suffered from migraines, loss of concentration, and issues
with his "neck, [his] shoulder, . . . [and his] left arm" since

2006, but made no reference to back pain generally or lower back pain specifically.[18]  (Tr. 83.)

Moreover, plaintiff's medical records suggest that his lumbar spine condition did not impact his ability to perform basic work activities.  For instance, a June 2007 office note from a two-year post-surgical follow-up visit to Dr. Lewis states that plaintiff "ha[d] returned to a lot of activity including playing tennis, however his lumbar spine degenerative disease is giving him some trouble."  (Tr. 547.)  The notes go on to state that plaintiff "did a lot of skiing this past winter" and "is working without difficulty."  (*Id.*)  The office notes from plaintiff's visit to Dr. Lewis in February 2009 similarly indicate that plaintiff was "doing extremely well" and was "quite active with sports and dancing," but do not mention any lumbar spine issues.  (Tr. 550.)  Further, the only work-related limitation referenced in the 2009 post-surgical follow-up notes relate to cramping in plaintiff's left forearm and hand, not any spinal issues.  (*Id.*)

Additionally, reports from multiple sources throughout 2010 and 2011, after the amended alleged onset date of April 1,

---

[18] The hearing transcript reflects that the ALJ noted that she lacked medical records going back to 2008 and stated that she would need such records if they existed.  (Tr. at 83-85.)  Plaintiff's representative acknowledged that there was a "lack of medical evidence in 2008," and stated that she had explained to plaintiff that this lack of evidence would make it "highly unlikely that he would be found disabled going back that far."  (Tr. 85.)

2010, indicate that pain from the plaintiff's lumbar spine was not causing any limitations. When Dr. Lewis examined plaintiff in August 2010, plaintiff claimed to be "very active with sports and dancing" and indicated that he had been working, (Tr. 552-53),[19] thus suggesting that he could perform basic work activities. Thus, although Dr. Lewis had noted plaintiff's lumbar spine condition in 2007, (Tr. 547), the condition was apparently not serious enough to merit any mention in 2009 or 2010.

Further, in May of 2011, Dr. Kushner, a treating physician, indicated that the plaintiff had no limitations for standing, walking, or sitting as of her last visit with him, in October 2010. (Tr. 367-68.) Dr. Kushner's May 2011 report attached various other medical records, some mentioning cervical spine issues, but none mentioning lumbar spine issues. (Tr. 366-82.) Later, in August of 2011, Dr. David Finkelstein, a consultative physician, observed that the plaintiff was walking with a normal gait and experienced no difficulty walking, getting on and off the examination table, or rising from a chair. (Tr. 390.) Office notes from a March 2012 visit to Dr. Riskevich, also a treating physician, also cast doubt on plaintiff's contention that his lumbar spine condition was

---

[19]     The examination notes from plaintiff's August 2010 examination by Dr. Lewis are also reproduced at pages 374 and 375 of the administrative transcript.

severe.  Those treatment notes expressly indicate that Dr. Riskevich examined plaintiff's lumbar spine, and although his diagnosis refers to issues with plaintiff's *cervical* spine, it is wholly silent as to any problems with plaintiff's *lumbar* spine.  (Tr. 640-41.)

Taken as a whole, this record provides ample information, and certainly "more than a mere scintilla" of "relevant evidence as a reasonable mind might accept as adequate" that plaintiff's lumbar spine impairment was not severe at the time of the amended alleged onset date.  *Burgess,* 537 F.3d at 127-28 (citations omitted).

### ii.  Left Knee Impairment

Plaintiff contends that the ALJ erred in finding that plaintiff's ACL tear of the left knee in 2009 was not a severe impairment, based on the medical record, "which shows that the [p]laintiff underwent a left knee MRI on October 7, 2010, which revealed evidence of an old ACL and posterolateral corner injury unchanged from prior examination," specifically a left knee MRI reviewed in May of 2009.  (Pl. Mem. at 17 (citation omitted).)

The court finds plaintiff's contention unavailing. There is no dispute that plaintiff suffered a partial tear of his ACL in 2009.  The relevant question at step two is whether and to what extent this impairment impacted plaintiff's ability to perform basic work activities.  Nothing in the record

demonstrates that plaintiff's left knee impairment resulted in a significant loss of function, and more than substantial evidence indicates precisely the contrary.

Plaintiff's reference to the results of a 2010 MRI is unavailing because it does not demonstrate a change in limitations as a result of plaintiff's ACL injury. (Pl. Mem. at 17.) Moreover, according to clinic notes from March 2009, when plaintiff sought medical treatment due to knee issues, which were later diagnosed as plaintiff's ACL injury, plaintiff reported that he injured his knee while skiing and was "able to continue skiing for some time" following the injury. (Tr. 326.) At this same March 2009 examination, plaintiff indicated that his ACL injury caused "mild pain when negotiating stairs," and "mild persistent pain," though he remained "able to walk about 10 blocks without any pain." (*Id.*) Notes from a follow-up visit in May 2009 indicate that plaintiff reported that he was "fine with straight-away activities, but with any kind of pivoting he has some pain on the inside of his knee." (Tr. 329.) Finally, notes from a July 2009 follow-up visit indicate that the visit specifically concerned plaintiff's ACL injury, and state that plaintiff had "no instability and no pain in the knee," that the exam "show[ed] a full range of motion," and that plaintiff was "asymptomatic" at the time of the exam. (Tr. 331.)

Additionally, as discussed above, plaintiff reported to Dr. Lewis in 2010 that he was "active with sports and dancing," (Tr. 374), and notes from that same examination indicate that plaintiff had "good strength in all his extremities." (Tr. 375.) The record also indicates that in May 2011, Dr. Kushner opined that plaintiff was able to walk without any difficulty or pain. (Tr. 368.)

The record thus contains substantial evidence indicating that plaintiff's ACL tear was not "severe," and none to the contrary.

**B.    Plaintiff's RFC**

Plaintiff next contends that the ALJ failed to evaluate properly plaintiff's RFC prior to March 1, 2012 in light of "the substantial record demonstrating chronic headaches and vertigo." (Pl. Mem. at 17.) More specifically, plaintiff argues that the ALJ committed reversible error by failing to consider properly the December 2011 opinion of Dr. Kushner, as well as the opinions of Dr. Riskevich and Dr. Finkelstein. (Pl. Mem. at 18-19.) Plaintiff further asserts that the ALJ impermissibly failed to accord controlling weight to the findings Dr. Kushner's December 2011 opinion and Dr. Riskevich's opinions, as they were both treating physicians but were given little weight by the ALJ. (Pl. Mem. at 19-27.) Finally, plaintiff asserts that the ALJ made an improper credibility

determination as to plaintiff.  (Pl. Mem. at 27-35.)  The court
finds that these contentions are without merit.

### i. *Finkelstein Opinion*

Although plaintiff contends that the ALJ "failed to
incorporate [Dr. Finkelstein's] findings" into the ALJ Decision
(Pl. Mem. at 19), it appears that Dr. Finkelstein's opinion is
consistent with the ALJ's RFC determination.  Dr. Finkelstein,
in relevant part, diagnosed vertigo and indicated the presence
of a "lacuna[r] infarct."  (Tr. 391.)  A lacunar infarct is
essentially a lesion in the brain.  *See* Nikolaos I.H.
Papamitsakis, M.D., *Lacunar Syndrome*, *available at*
https://emedicine.medscape.com/article/1163029-overview (last
visited Feb. 28, 2018) (discussing lacunar infarcts).  Dr.
Finkelstein's diagnosis is therefore consistent with the ALJ's
determination that plaintiff was impaired on account of
hyperlucent density of the cerebellum.

More importantly for purposes of the present analysis,
Dr. Finkelstein's opinion as to plaintiff's functional capacity
is appropriately reflected in the ALJ Decision.  Dr. Finkelstein
noted full grip strength and muscle strength in plaintiff's
extremities, as well as normal gait and station.  (Tr. 390-91.)
As to plaintiff's functional limitations, Dr. Finkelstein opined
only that plaintiff "should avoid heights and no[t] operate

heavy machinery," and that cervical spine-related pain may limit
plaintiff's ability to "sustain activities."  (Tr. 391.)

     To reiterate, the ALJ concluded that prior to March 1,
2012, claimant had the residual functional capacity to perform
sedentary work.  (Tr. 56.)  Dr. Finkelstein's opinion that
plaintiff should avoid heights and not operate heavy machinery,
and may not be able to "sustain" unspecified "activities" simply
does not militate against the ALJ's conclusion.  Moreover, other
information in Dr. Finkelstein's report affirmatively supports a
conclusion that plaintiff could perform sedentary work,
particularly Dr. Finkelstein's findings that plaintiff had full
grip and muscle strength and normal gait and station, as well as
the report's statement that plaintiff cooked, showered, and
dressed himself daily, did laundry and went shopping weekly, and
socialized with friends.  (Tr. 389.)

### ii.  *Treating Physician Opinions*

     Plaintiff also contends that the ALJ improperly gave
Dr. Kushner's December 2011 opinion and Dr. Riskevich's opinions
little weight.  (Pl. Mem. at 19-26.)

     As discussed above, when an ALJ does not afford
"controlling weight" to a treating physician's opinion on the
nature and severity of a claimant's disability, the ALJ must set
forth his or her reasons for the weight assigned to a treating
physician's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2);

*Halloran,* 362 F.3d at 32-33. Further, failure to provide "good reasons" for disregarding a treating physician's opinion is grounds for remand, though where an ALJ comprehensively sets forth the reasons for the weight given to a treating physician's opinion, the ALJ's determination will be upheld. *See Halloran,* 362 F.3d at 32-33 (citation omitted) (concluding that ALJ properly determined that treating physician should not be afforded controlling weight where that opinion was inconsistent with other substantial evidence in the record).

Importantly, the regulations set forth various "factors" that ALJs must consider in determining whether to give a treating physician's opinion controlling weight. *See* 20 C.F.R. §§ 404.1527(c); 416.927(c). However, one factor may be dispositive. *See Halloran*, 362 F.3d at 32-33 (concluding that ALJ properly applied substance of treating physician rule where the ALJ "considered the treating physician's opinion and explained the consistency of [the treating physician's] opinion 'with the record as a whole'" (citation omitted)).

Here, the ALJ properly applied the treating physician rule because she sufficiently discussed the substantial evidence in the record that was relevant to the weight she gave the Dr. Kushner's December 2011 opinion and Dr. Riskevich's opinion, and as such sufficiently explained the consistency of the treating physicians' opinions with the record as a whole.

### a.     *Kushner December 2011 Opinion*

The ALJ afforded "little weight" to Dr. Kushner's

December 2011 opinion, (Tr. 58.), which was in form of responses

to a "Multiple Impairment Questionnaire." (Tr. 393-400.)  In

response to specific questions, Dr. Kushner indicated that

plaintiff could not sit or stand more than one hour per day,

that it would be medically necessary for plaintiff to not sit or

stand continuously in a work sitting, and that plaintiff could

only occasionally lift and/or carry more than five pounds. (*Id.*)

The ALJ set forth a number of reasons for giving this

opinion "little weight," including that the December 2011

opinion contradicted Dr. Kushner's own May 2011 opinion and

lacked any clinical findings or other explanation as to the

dramatic change in plaintiff's condition.  (Tr. 58-59.)  The ALJ

also noted that, although plaintiff's medical treatment in 2011

was "sporadic," the evidence that did exist was wholly

inconsistent with Dr. Kushner's December 2011 opinion, including

"consistent documentation of full activities of daily living,

and active hobbies such as sports and dancing," as well as

"objective testing . . . reveal[ing] mostly normal results."

(*Id.*)

The ALJ's description of the record is correct.  As

stated above, in May 2011, based on an October 6, 2010 exam, Dr.

Kushner opined that there were no limitations on plaintiff's

ability to sit and stand and/or walk. (Tr. 367-68.) The record indicates that this May 2011 opinion was informed by the August 2010 five-year post-surgery follow-up assessment of Dr. Lewis, which takes the form of a communication directed to Dr. Kushner, (Tr. 374-75), and is included in the administrative transcript as an attachment to Dr. Kushner's May 2011 opinion. (*See generally* Tr. 366-82.) To reiterate, Dr. Lewis's report noted that plaintiff was doing "extremely well" with respect to his neck, his spine x-rays "look[ed] quite good," had "good strength in all his extremities," and was "very active with sports and dancing." (Tr. 374-375.)

As indicated above, Dr. Kushner's December 2011 opinion marked a complete departure from these assessments. Further, Dr. Kushner's December 2011 report refers to a 2009 MRI as the only "laboratory and diagnostic test results" supporting the diagnosis, (Tr. 394), but contains no explanation as to when and how the issue revealed in that MRI, specifically a chronic lacunar cerebellar infarct, gave rise to plaintiff's limitations. Nor does Dr. Kushner's December 2011 report, which indicated that she treated plaintiff three to four times per year, (Tr. 393), explain the cause of the precipitous decline in plaintiff's functioning, or even expressly acknowledge that plaintiff's condition had deteriorated.

Moreover, the record contains other evidence that is that calls into question Dr. Kushner's December 2011 opinion. Objective evidence in the record includes reports of MRI scans from July 2011, indicating that plaintiff's cervical spine was "stable compared with October 2008," (Tr. 387), and his brain was "stable compared with November 2009." (Tr. 434.) In other words, objective findings with respect to plaintiff remained the same, but Dr. Kushner's opinion regarding his limitations changed drastically with no explanation.

The record also includes notes from Dr. Finkelstein in August of 2011. Dr. Finkelstein noted that plaintiff reported suffering from dizzy spells three to four times per day, for twenty minutes at a time, and had trouble lifting heavy objects. (Tr. at 389.) However, Dr. Finkelstein also noted that plaintiff cooked seven days per week, did laundry and shopping weekly, showered and dressed every day, listened to the radio, read, and socialized with friends. (*Id.*) Additionally, Dr. Finkelstein noted full grip strength and muscle strength in plaintiff's extremities, as well as normal gait and station. (Tr. 390-91.) As discussed above, regarding plaintiff's limitations, Dr. Finkelstein opined that plaintiff may have difficulty sustaining unspecified activities, and that he "should avoid heights and no[t] operate heavy machinery." (Tr. 391.) As the court has stated, however, Dr. Finkelstein's

opinion simply does not suggest that plaintiff could not perform sedentary work, as the ALJ concluded he could, and more generally is not consistent with the much more severe limitations as to which Dr. Kushner opined in December 2011.

The ALJ therefore gave "good reasons" for the weight she afforded Dr. Kushner's opinion, and the record supports those reasons.[20] The court also notes that even if the ALJ had given Dr. Kushner's December 2011 opinion controlling weight, it would not have significantly altered the outcome for plaintiff, as the ALJ determined that plaintiff's disability insurance coverage lapsed after September 30, 2011. (Tr. 53, 55.) Therefore, a finding that plaintiff was disabled in December of 2011 would not have sufficed to entitle plaintiff to receive DIB.

### b. *Riskevich Opinions*

The ALJ also afforded little weight to the opinions of Dr. Riskevich, another treating source. (Tr. 59.) In an undated medical report reflecting a most recent treatment date of February of 2011, Dr. Riskevich concluded that the plaintiff could not stand or walk, and could only sit up to 30 minutes continuously and a total of one hour per day, on "a daily

---

[20] Plaintiff suggests that the ALJ's reasoning and conclusion are flawed in light of multiple occasions on which Dr. Kushner referred the plaintiff for medical testing, (Pl. Mem. at 22), but it is not clear how those referrals provide support for the December 2011 opinion, nor do those referrals detract from the evidence supporting the May 2011 opinion.

sustained, competitive basis." (Tr. 338, 340.) That same
report indicated that plaintiff could "never" lift or carry
items of any weight, nor could plaintiff ever bend, squat,
climb, or reach during an 8-hour workday. (Tr. 340-41.) The
objective clinical findings and test results listed as the basis
for these conclusions were a VNG report dated November 1, 2010,
an MRI of the head dated December 31, 2009, and an MRI of the
cervical spine dated October 18, 2006. (Tr. 338.)
Additionally, in a wellness plan dated February 8, 2011, Dr.
Riskevich opined that plaintiff was "[u]nable to work for at
least 12 months," and noted that plaintiff should not drive or
operate machinery. (Tr. 359-60.)[21]

      The ALJ determined that Dr. Riskevich's opinions were
"not consistent with [other] examination findings" during the
relevant period of time, and as such were due only little
weight. (Tr. 59.) The ALJ referenced substantially the same

---

[21]     The record also includes office visit notes from Dr. Riskevich dated
April 3, April 8, April 13, April 16, April 19, April 21, May 12, June 2, and
June 9, 2010. (Tr. 343-55.) These reports generally reflect reports of pain
in the neck, shoulders, and/or upper back, in some cases radiating down to
plaintiff's arms, as well as some reports of lower back pain radiating to
plaintiff's left leg. (*See id.*) The reports also reflect decreased
activities of daily living. (*See id.*) However, they lack any specificity as
to the extent to which plaintiff's ability to function is limited. Moreover,
these notes precede plaintiff's August 2010 examination by Dr. Lewis. As the
court has noted, the notes of that August 2010 exam indicate that plaintiff
was doing "extremely well" with regards to his neck, and was "very active
with sports and dancing." (Tr. 374.) Moreover, the August 2010 examination
notes indicate that Dr. Lewis and his Physician's Assistant reviewed
plaintiff's cervical spine x-rays, and that those x-rays looked "quite good."
(*Id.*) The subsequent examination notes from Dr. Lewis and his Physician's
Assistant thus, at a minimum, cast significant doubt on Dr. Riskevich's
notes, and do so with objective x-ray evidence.

examination notes that led her to give little weight to Dr. Kushner's December 2011 opinion, and additionally referenced Dr. Kushner's own May 2011 opinion.  (Tr. 58-59.)  To reiterate briefly, in August 2011 plaintiff reported to Dr. Finkelstein a range of daily and weekly activities that are not consistent with Dr. Riskevich's opinion regarding plaintiff's functional capacity. (Tr. 389.)  Additionally, in August 2010, plaintiff reported that he was "very active with sports and dancing" to Dr. Lewis. (Tr. 374.)  Further, Dr. Lewis reported that plaintiff "ha[d] no cervical [spine] pain," no "true neck pain and no upper extremity radicular symptoms," and that plaintiff's x-ray looked "quite good."  (Tr. 374-75.)  Thus, for substantially the same reasons that the court has concluded that the ALJ properly applied the treating physician rule with respect to Dr. Kushner's December 2011 opinion, the court concludes that the ALJ gave "good reasons" for the weight she accorded Dr. Riskevich's opinions, and that those reasons are supported by the record.

The court also notes that the record includes statements by plaintiff that appear inconsistent with Dr. Riskevich's opinions.  For instance, in a self-prepared function report submitted to the New York State Office of Temporary Disability Assistance in May of 2011, plaintiff reported that he could still walk half a mile before needing to rest for only

five minutes, (Tr. 295), though Dr. Riskevich opined that plaintiff could not walk at all on a daily basis. (Tr. 340.) The same function report also stated that "it is extremely difficult for [plaintiff] to lift anything heavier than [ten pounds]," (Tr. 294), yet Dr. Riskevich's opinion was that plaintiff could not lift anything at all in the course of his employment. (Tr. 340.)

Additionally, although not referenced by the ALJ, a VNG report dated three weeks after the report on which Dr. Riskevich indicated he relied, and issued from the same audiologist, stated that "[t]he findings obtained indicate NORMAL VNG results for the battery of tests completed today," and that the "spontaneous nystagmus noted during [the] previous VNG on 11/01/10, was not evident today." (Tr. 357; Tr. 338 (indicating that Dr. Riskevich relied on earlier VNG report); Tr. 356 (consisting of earlier VNG report).) The court also notes that the other objective evidence on which Dr. Riskevich indicated he relied consists of MRI scans from 2009 and 2010, although record evidence discussed above, including reports from examinations by Dr. Lewis in both years, indicates that plaintiff did not suffer significant functional limitations at that time. Dr. Riskevich was treating plaintiff at the time of plaintiff's 2010 examination by Dr. Lewis, but Dr. Riskevich's reports shed no light on the discrepancy between his opinion and

the information contained in Dr. Lewis's reports. (*See* Tr. 338 (indicating that Dr. Riskevich first treated plaintiff on April 3, 2010) and 374 (indicating that plaintiff was examined by Dr. Lewis on August 20, 2010).)

In sum, the ALJ provided good reasons for the weight she gave Dr. Riskevich's opinions, and the record provides ample support for those reasons.[22]

### C.  Plaintiff's Credibility

Plaintiff contends that the ALJ committed legal error by failing to follow SSR 16-3P, which modified the standard at step two of an RFC inquiry such that it is no longer proper for an ALJ to make a credibility determination based on an individual claimant's character. (Pl. Mem. at 27; *see also* SSR 16-3P, 2016 WL 1119029, at *1-2.)  This argument is unavailing as SSR 16-3P is inapplicable to this proceeding.  SSR-16-3P became effective on March 16, 2016, well after the ALJ issued her decision on September 27, 2013.  SSR 16-3P, 2016 WL 1119029 at *1.  At the time of the hearing and the ALJ Decision, SSR 96-7P was controlling.  *See* SSR 16-3P, 2016 WL 1119029 at *1 (noting that SSR 16-3P supersedes SSR 96-7P); *see also* SSR 96-

---

[22]    The court notes that plaintiff contends that the ALJ improperly gives controlling weight to the opinion of a Dr. Flach, a consultive SSA doctor, (Pl. Mem. at 26), but the record contains no references to the involvement of any Dr. Flach with respect to plaintiff.  Moreover, as discussed herein, to the extent the ALJ does not give weight to certain treating physician opinions, she does so on the basis of records from other, non-SSA-affiliated physicians who examined plaintiff.

7P, 1996 WL 374186 at *1, *9 (noting SSR 96-7P was dated as of July 2, 1996 and effective as of the date of its publication in the Federal Register).

SSR 96-7P expressly allowed ALJs to assess the credibility of a claimant's statements during an RFC determination and enumerated the factors relevant to such an assessment. SSR 96-7P, 1996 WL 374186 at *1-3. More specifically, SSR 96-7P provided that, "when assessing the credibility of an individual's statements," regarding pain or other symptoms, ALJs must consider the objective medical evidence as well as: (1) "the individual's daily activities;" (2) "the location, duration, frequency, and intensity of the individual's pain or other symptoms;" (3) "precipitating and aggravating factors;" (4) "the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;" (5) "treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;" (6) "any measures other than treatment the individual uses or has used to relieve pain or other symptoms;" and (7) "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7P, 1996 WL 374186, at *3; *see also* 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii); 416.929(c)(3)(i)-(vii).

The ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight," SSR 96-7P, 1996 WL 374186 at *2, *accord Snyder v. Barnhart*, 323 F. Supp. 2d 542, 547 (S.D.N.Y. 2004), but need not expressly discuss all of the aforementioned credibility factors as as they are "examples of alternative evidence that may be useful, and not [] a rigid, seven-step prerequisite to the ALJ's finding." *Snyder*, 323 F. Supp. 2d at 546 (citation omitted).

The ALJ Decision clearly comports with SSR 96-7P. In finding that the plaintiff's assertions regarding his disability prior to March 1, 2012 were "less than credible," the ALJ considered evidence of the plaintiff's daily activities as well as evidence that shed light on the location, duration, frequency, and intensity of the claimant's symptoms, and on plaintiff's functional limitations. (*See* Tr. 57-58.) For instance, the ALJ Decision notes statements by the plaintiff that he "was staying active with activities such as dancing" and "was still working at the bank" as of August 2010, after his amended alleged disability onset date. (Tr. 58 (citing Tr. 374-75).)

The ALJ also considered the treatment plaintiff
received, which had been "sporadic" and marked by "minimal
reports of pain, and mostly normal examination results," (*Id.*)
including an opinion from Dr. Kushner that "the claimant had no
limitations as of May 2011." (*Id.* (citing Tr. 366-82).)
Although, as noted above, Dr. Kushner's May 2011 opinion
indicated that she had last seen plaintiff in October of 2010,
this examination nevertheless took place after plaintiff's
amended alleged onset date. These precise references to record
evidence make clear that the ALJ determined that specific
statements regarding his symptoms were not credible based on
specific evidence in the record, and not, as plaintiff contends,
that the plaintiff himself "is not a truthful person and
therefore not credible." (Pl. Mem. at 27.)

The ALJ's determination is wholly proper so long as it
is supported by substantial evidence.[23] Plaintiff disputes the
sufficiency of the evidentiary support for the ALJ's
conclusions, but does not identify any issues with the evidence
to which the ALJ Decision cites. Instead, plaintiff argues that
"there are multiple treatment records with reports of severe

---

[23]    It appears to the court that some sort of credibility determination may
in fact be necessary where, as here, plaintiff testifies at his hearing that
he never made certain statements that are reflected in doctors' treatment
notes, and those statements are material to his claims, at least as initially
filed. (*See* Tr. at 78-80 (consisting of testimony in which plaintiff insists
he never told doctors he was injured in a 2009 skiing accident, as reflected
in treatment notes).)

pain" for the relevant period.  (Pl. Mem. at 28)  In support of
his argument, plaintiff essentially transcribes notes from his
visits to doctors between April 1, 2010 and March 1, 2012, but
does not explain the significance or relevance of any of these
notes.  (Pl. Mem. at 28-34.)  A review of these notes indicates
that the plaintiff's contention that they undermine the ALJ
Decision is without merit.

        Several of the treatment notes to which the plaintiff
cites do not undermine, and in at least one instance
affirmatively support, the ALJ Decision.  For instance,
plaintiff cites Dr. Kushner's May 2011 report that "[p]laintiff
had no limitations for standing, walking or sitting," (Pl. Mem.
at 32-33 (citing Tr. 366-72)), as well as Dr. Finkelstein's
August 2011 report indicating that plaintiff's "severe neck pain
was gone," that he "independently showered and dressed himself,
watched television, listened to the radio, read and socialized
with friends," and that he "was able to walk on heels and toes
without difficulty" and "need[ed] no help changing for the
examination or getting on and off the examination table."  (*Id.*
at 33-34 (citing Tr. 389-91).)

        Plaintiff also cites notes from an April 1, 2010 visit
to Dr. Alexander Berenblit indicating that plaintiff suffered a
"severe restriction of motion of the cervical spine," and was
diagnosed with "traumatic head injury with a residual of

persistent pressure type headaches" and a "severe sprain/strain of the cervical spine." (*Id.* at 28-29 (citing Tr. 333-35).) Plaintiff does not, however, explain the impact of these conditions on the plaintiff, or address their inconsistency with Dr. Lewis's August 2010 report that plaintiff's cervical spine x-rays looked "very good," and that plaintiff was generally doing "extremely well" and was "not really complaining of true neck pain and [had] no upper extremity radicular symptoms." (Tr. 374.) Similarly, plaintiff cites notes from his visit to Dr. Riskevich on April 3, 2010, which indicate that plaintiff was diagnosed with "cervical spine enthesopathy, pain in the joint/shoulder, upper extremity dysfunction, [and] myofascial pain syndrome," and suffered from "acute pain" and "decreased activities of daily living," but does not explain the impact of these conditions. (Pl. Mem. at 29-30 (citing Tr. 344-45).)

At most, these treatment notes, and others like them, are consistent with a conclusion that prior to March 1, 2012, the plaintiff suffered from a medically determinable impairment that could reasonably be expected to cause plaintiff's alleged symptoms. There is no dispute, however, that plaintiff suffered from such an impairment prior to March 1, 2012; the relevant inquiry is as to plaintiff's RFC. The treatment notes plaintiff references, however, shed little to no light on the intensity or severity of plaintiff's symptoms. As such, the treatment notes

do not undermine the ALJ Decision.  Moreover, the record

contains substantial evidence that plaintiff did not suffer

impairments or symptoms that would render him unable to perform

sedentary work throughout 2010 and 2011, including Dr. Kushner's

May 2011 opinion, Dr. Lewis's examination notes from August

2010, which incorporate objective medical evidence, and Dr.

Finkelstein's report.

The ALJ therefore properly concluded that plaintiff's

allegations regarding those symptoms were not credible until

March 1, 2012, and that the plaintiff did not become disabled

until that date.  (Tr. 58-59.)

### Conclusion

For the foregoing reasons, the plaintiff's motion for

judgment on the pleadings is denied, the Commissioner's motion

for judgment on the pleadings is granted, and the decision of

the ALJ is affirmed.  The Clerk of Court is respectfully

requested to dismiss this action and enter judgment for

defendant.

**SO ORDERED.**

Dated: Brooklyn, New York
       April 20, 2018

                              _____/s/_____
                              KIYO A. MATSUMOTO
                              United States District Judge
                              Eastern District of New York